**Application of Ignazio Almerindo MARTINI, for Naturalization under Public Law 114.**

United States District Court
S. D. New York.
May 31, 1960.

Nancy Helm Plant, Pleasantville, N. Y., for applicant.

Howard I. Cohen, U. S. Naturalization Examiner, Immigration and Naturalization Service, New York City.

FREDERICK van PELT BRYAN, District Judge.

This is an application to take the oath of allegiance and renunciation under Public Law 114, 82nd Congress, Act Aug. 16, 1951, 65 Stat. 191, by a former native-born citizen of the United States, Ignazio Almerindo Martini, who lost his citizenship by voting in an Italian election on June 2, 1946. The petition is opposed by the Immigration and Naturalization Service.

Two questions are presented. The first is whether the petitioner is eligible for the benefits of Public Law 114, as amended by the Immigration and Nationality Act of 1952, 66 Stat. 278, 8 U.S. C.A. § 1435 note.[1] If petitioner is eligible for naturalization under Public Law 114, the second question is whether he is ineligible to be naturalized because of the provisions of Section 318 of the Im-

---

1. Public Law 114 as amended provided in material part:

"That a person who, while a citizen of the United States, has lost citizenship of the United States solely by reason of having voted in a political election or plebiscite held in Italy between January 1, 1946, and April 18, 1948, * * * may be naturalized by taking, prior to two years from the enactment of this Act * * *, before any naturalization court * * * the oath required by section 337 of the Immigration and Nationality Act. * * *."

migration and Nationality Act of 1952 (8 U.S.C.A. § 1429).[2]

The facts are not in dispute. The examiner stated the background of the case as follows:

"The applicant, Ignazio Almerindo Martini, was born in New York, New York on October 14, 1905. He went to Italy at an early age and resided there until his return to the United States as an alien visitor for pleasure for a three month period. This entry was effected on March 19, 1950 on the ship 'Biancamano' at New York, New York. On October 19, 1950, a warrant of arrest was issued against the applicant on the grounds that he was an immigrant not in possession of a valid immigration visa, having entered ostensibly for pleasure but in reality for the purpose of proving his citizenship. After being duly heard on the charge, a warrant of deportation was issued and he was ordered deported. On April 1, 1952, the order of deportation was withdrawn and the applicant was given sixty days within which to depart voluntarily, that is, until May 31, 1952. Prior to the deadline for his departure, applicant submitted an application for leave to take an oath of allegiance under Public Law 114; this is that application.

"Because of his failure to depart voluntarily, the applicant was again brought up on deportation charges; after further hearing, he was again held deportable and there is presently outstanding an order of deportation against the applicant. (Exhibit 1). On May 23, 1956 an order (Exhibit 2) staying deportation was issued, which order is still in effect."

One crucial fact is omitted from the examiner's findings.

After the withdrawal of the order of deportation on April 1, 1952, and the expiration of the 60 days given for voluntary departure, petitioner moved for relief before the Board of Immigration Appeals. By this time, as the examiner noted, he had already filed his application under Public Law 114. He requested an extension of the time for voluntary departure so that his application could be processed. The Board not only granted this relief but withdrew the order of deportation, which had been automatically reinstated by the expiration of the time given for voluntary departure.

The Board stated:

"It is our opinion that respondent should be granted sufficient time to process his application for expeditious naturalization under Public Law 114. We will grant him such time as is necessary for that purpose."

At the conclusion of its decision the Board made the following order:

"Order: It is ordered that the outstanding order of deportation be withdrawn and the alien be permitted to depart from the United States voluntarily without expense to the Government, to any country of his choice, within such period of time, in any event not less than six months, and under such conditions as the officer-in-charge of the District deems appropriate.

"It Is Further Ordered that if the alien does not depart from the United States in accordance with the foregoing, the order of deportation be reinstated and executed."

The examiner reasoned that because his decision was rendered more than six

2. The relevant portion of § 318 provides: " * * * no person shall be naturalized against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest issued under the provisions of this chapter or any other Act; and no petition for naturalization shall be finally heard by a naturalization court if there is pending against the petitioner a deportation proceeding pursuant to a warrant of arrest issued under the provisions of this chapter or any other Act."

months after the Board's opinion withdrawing the deportation order, naturalization was barred by Section 318 since the order of deportation had by then become reinstated. He also concluded that since Public Law 114 had expired by this time this petitioner could not in any event be naturalized under that statute.

## I. The applicability of Section 318.

I hold that under the circumstances of this case Section 318 is not a bar to petitioner's naturalization.

There is grave doubt as to whether Section 318 was intended to apply to Public Law 114. Public Law 114 is a narrow and specific enactment and applies by its terms to what must be a very small group. Even as to this small group the relief granted by the statute is limited in time. As was pointed out in Shomberg v. United States, 348 U.S. 540, 75 S.Ct. 509, 99 L.Ed. 624, the legislative purpose in enacting Section 318 was to prevent a race between an alien and the immigration authorities to be naturalized before deportation proceedings could be completed. Section 318 gives priority to deportation proceedings over naturalization proceedings which previously could be conducted concurrently. See, also, United States ex rel. Jankowski v. Shaughnessy, D.C.S.D.N.Y., 93 F.Supp. 7, affirmed 2 Cir., 186 F.2d 580.

Under Section 318 the mere pendency of a deportation proceeding or a final finding of deportability "pursuant to a warrant of arrest" prevented naturalization from occurring before the final disposition of such deportation proceedings.

Presence in the United States, lawful or unlawful, does not affect the right to naturalization under Public Law 114. This liberal statute specifically provides that those few to whom it applies "may be naturalized by taking, prior to two years from the enactment of this Act * * *, before any naturalization court * * * *or before any diplomatic or consular officer of the United States abroad*, the oath required by section 337 of the Immigration and Nationality Act * * * *."* Thus, the expatriate applying to take the oath may be naturalized in any place where there is a diplomatic or consular officer and does not have to be in this country at all. Under these circumstances it cannot be said that Congress intended Section 318 to apply to Public Law 114. Had this petitioner been actually deported and thus no longer under an "outstanding" order of deportation he would still have been eligible to take the oath any place where there was a diplomatic or consular officer of the United States. I do not therefore interpret Section 318 as applying to the very limited class given special relief by Public Law 114 under the special circumstances there provided for.

However, even if Section 318 were applicable in this case the result would be the same. When the Board of Immigration Appeals granted Martini relief from the deportation proceeding on October 5, 1953 the express reason was that "respondent [Martini] be granted sufficient time to process his application for expeditious naturalization under Public Law 114." The Board further stated "[w]e will grant him such time as is necessary for that purpose," and again said, "Respondent will be granted an extension of departure time in order to secure adjudication of his petition under Public Law 114 for expeditious naturalization".

Thus, the purport of the decision of the Board of Immigration Appeals was to give to Martini such relief as would enable his petition for naturalization to be granted if he was eligible under Public Law 114. It is true that the specific relief granted took the form of voluntary departure. However, the stated *purpose* of this relief was "in order to secure adjudication of his petition".

Thus, petitioner applied for and was granted administrative relief so that he might obtain an adjudication of his petition already timely filed under Public Law 114. He was told that if he were eligible under that law the road was

clear and that he could remain in the United States to have his application acted upon here.

Had such relief not been granted the petitioner could have departed from the United States voluntarily, thus satisfied the order of deportation, and then made application to an appropriate United States diplomatic or consular office abroad, as the Act entitled him to do. The decision of the Board represented to petitioner that such procedure was unnecessary. Petitioner was plainly entitled to rely on that representation. There was nothing more for the petitioner to do except to wait for what he vainly hoped would be an expeditious decision on his application.

To hold now, long after Public Law 114 has expired, that Section 318 always was a bar to adjudication of his petition under Public Law 114 would be to say that the representations made by the Board of Immigration Appeals of the United States Department of Justice were a sham and a fraud upon the petitioner. A body of this stature could scarcely do more to "lull this petitioner into misconception of the legal consequences * * *" of failing to take the alternative course of action open to him. Moser v. United States, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729. The law will not permit such a result. Moser v. United States, supra; Matter of Bouchage, D.C. S.D.N.Y., 177 F.Supp. 887.

Once lulled into security by the decision of October 5, 1953 Martini could

justifiably await the outcome of the administrative processing of his petition.[3]

II.  The expiration of Public Law 114.

■  As previously noted, the examiner in this case held that petitioner was barred from taking the oath under Public Law 114 by reason of the expiration of that statute. This conclusion of law is erroneous.

There is no doubt that the preliminary application required by Immigration and Nationality regulations was filed by petitioner on May 16, 1952, well within the original time limited by the statute. Public Law 114 first became effective on August 16, 1951 and by its terms was to continue to be effective for two years thereafter, viz., until August 16, 1953. It was amended and repassed by Section 402(j) of the Immigration and Nationality Act of 1952. This Act became effective on June 27, 1952. There was some doubt as to whether the re-enactment of Public Law 114 on June 27, 1952 extended the two year provision until June 27, 1954.[4]

But whether August 16, 1953 or June 27, 1954 is viewed as the expiration date of Public Law 114, as amended, is of no moment here. For here the petitioner filed his "Preliminary form to take oath of allegiance under Public Law 114, 82nd Congress" on May 16, 1952, long before the earlier of the two dates.

The filing of the preliminary form to take the oath of allegiance, Form N–442, was all that petitioner was able or entitled to do.[5] After that petitioner could

---

3.  It may be that the setting aside of the order of deportability of the Board of Immigration Appeals had the effect of rendering Section 318 inapplicable in any event. This would be the result if the Board's order was construed as setting aside the "final finding of deportability" which is necessary to bring Section 318 into play. If this is the case the Board order should, under the circumstances of this case, be construed to be effective for "sufficient time to process his application for expeditious naturalization" rather than the overly optimistic and ambiguous "period of time, in any event not

less than six months" which was granted by the Board's decision.

4.  But the Application of Pesola, #5749 (Sept. 5, 1956) holds that the latter date, June 27, 1954, is the expiration date of the statute.

5.  The regulations enacted under Public Law 114 (Immigration and Nationality Rules and Regulations § 402.11, 1953 U.S.Code Cong. and Adm.News p. 2678) prescribed the following procedural requirements for taking the oath of allegiance: "A person * * * who applies in the United States to take the

only wait to be called to take the oath of allegiance [6] and this was entirely dependent on the speed of the administrative processes of the Naturalization Service. The next step was entirely up to them.

While the years passed without administrative action on Martini's application Martini was not inactive. The record contains two letters from members of Congress, one in 1955 and one in 1958, attempting to determine the status of Martini's application which negative any inference that Martini abandoned his application. Cf. In re Carnavas, D.C.S.D. N.Y., 155 F.Supp. 12.

The dilemma in which petitioner finds himself is not of his own making. The unexplained administrative delay following Martini's filing of his preliminary application if given controlling weight would frustrate Public Law 114. I have recently considered a somewhat analogous situation. See In re Vacontios' Petition, D.C.S.D.N.Y., 155 F.Supp. 427. What I said there (at page 430) is applicable here:

> "He was required to file Form N-400, and having done that, could do no more until notified by the Service to appear for the purpose of filing a petition for naturalization. It is difficult to believe that Congress intended that applicants for naturalization * * * should lose all their rights by the Service's failure to act promptly, or because of other circumstances beyond the applicant's control. It would seem that the Congressional desire to enact a 'special equitable provision * * *' would be frustrated by the construction urged upon me * * *."

"* * * When one takes all necessary affirmative steps to comply with the literal requirements of a statute and is prevented from complying fully by the failure of an administrative agency to take the steps necessary to permit his compliance he will not be barred from asserting his rights under that statute. Lee Hong v. Acheson, D.C.N.D.Calif., 110 F.Supp. 60; Lee Bang Hong v. Acheson, D.C.D.Hawaii, 110 F.Supp. 48." At page 433.

This is just what happened here.

Moreover, another principle applies here, *actus curiae neminem gravabit*. In Mitchell v. Overman, 103 U.S. 62, at pages 64–65, 26 L.Ed. 369, the court said as to this principle:

> "We content ourselves with saying that the rule established by the general concurrence of the American and English courts is, that where the delay in rendering a judgment or a decree arises from the act of the court, that is, where the delay has been caused either for its convenience, or by the multiplicity or press of business, either the intricacy of the questions involved, or of any other cause not attributable to the laches of the parties, the judgment or the decree may be entered retrospectively, as of a time when it should or might have been entered up. In such cases, upon the maxim *actus curiae neminem gravabit*,—which has been well said to be founded in right and good sense, and to afford a safe and certain guide for the administration of justice,—it is the duty of the

oath of allegiance [under Public Law 114] shall submit to the Service a preliminary application to take such oath on Form N–442 * * *. The oath shall be taken prior to August 16, 1953 [regulation enacted before amendment to Public Law 114 changed the date to June 27, 1954], and may be taken before any naturalization court regardless of the applicant's place of residence. The eligibility of the applicant to take the oath shall be investigated by a member of the Service, who shall make an appropriate recommendation to the naturalization court * * *."

6. There was one further procedural step which was taken by the Service. On June 7, 1954, over two years after Martini filed his preliminary application, he was notified that the petition for naturalization was filed as of June 7, 1954.

**402**

court to see that the parties shall not suffer by the delay. A *nunc pro tunc* order should be granted or refused, as justice may require in view of the circumstances of the particular case."

I see no reason why this principle should not apply equally to the delay caused by administrative inaction of the nature which occurred here.[7] In any event petitioner would be entitled to take the oath of allegiance *nunc pro tunc.*

The petition for naturalization is granted.

It is so ordered.

---

7. The Immigration and Naturalization Service itself has recognized this principle. See 8 C.F.R. § 334.1.